IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION

GENA M. OLIVER,

        Plaintiff,

vs.

MICHAEL J. ASTRUE,
Commissioner of the Social Security
Administration,

        Defendant.

No. C08-1021

RULING ON JUDICIAL REVIEW

_____

## TABLE OF CONTENTS

I.     INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.    PROCEDURAL BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . 2

III.   PRINCIPLES OF REVIEW. . . . . . . . . . . . . . . . . . . . . . . . . . 3

IV.   FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
      A.    Oliver's Education and Employment Background. . . . . . . . . . . . 4
      B.    Administrative Hearing Testimony. . . . . . . . . . . . . . . . . . . 4
           1.    Oliver's Testimony. . . . . . . . . . . . . . . . . . . . . . . 4
           2.    Vocational Expert's Testimony. . . . . . . . . . . . . . . . . 6
      C.    Oliver's Medical History. . . . . . . . . . . . . . . . . . . . . . . . 7

V.     CONCLUSIONS OF LAW. . . . . . . . . . . . . . . . . . . . . . . . . . 12
      A.    ALJ's Disability Determination. . . . . . . . . . . . . . . . . . . . 12
      B.    Objections Raised by Claimant. . . . . . . . . . . . . . . . . . . . 14
           1.    Listing 12.06. . . . . . . . . . . . . . . . . . . . . . . . . . 14
           2.    Oliver's RFC. . . . . . . . . . . . . . . . . . . . . . . . . . 17
           3.    Dr. Sadler's Opinions. . . . . . . . . . . . . . . . . . . . . 19

VI.   CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

VII.  ORDER. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

## I. INTRODUCTION

This matter comes before the Court on the Complaint (docket number 4) filed by Plaintiff Gena M. Oliver on July 10, 2008, requesting judicial review of the Social Security Commissioner's decision to deny her applications for Title II disability insurance benefits and Title XVI supplemental security income ("SSI") benefits. Oliver asks the Court to reverse the decision of the Social Security Commissioner ("Commissioner") and order the Commissioner to provide her disability insurance benefits and SSI benefits. In the alternative, Oliver requests the Court to remand this matter for further proceedings.

## II. PROCEDURAL BACKGROUND

On November 16, 2004, Oliver applied for both disability insurance benefits and SSI benefits. In her applications, Oliver alleged an inability to work since October 28, 2004 due to arthritis and feet, ankle, hand, and wrist problems. Oliver's applications were denied on February 11, 2005. On May 24, 2005, her applications were denied on reconsideration. On July 5, 2005, Oliver requested an administrative hearing before an Administrative Law Judge ("ALJ"). On August 21, 2007, Oliver appeared with counsel via video conference before ALJ John E. Sandbothe for an administrative hearing. Oliver and vocational expert Carma A. Mitchell testified at the hearing. In a decision dated September 7, 2007, the ALJ denied Oliver's claims. The ALJ determined that Oliver was not disabled and not entitled to disability insurance benefits or SSI benefits because she was functionally capable of performing other work that exists in significant numbers in the national economy. Oliver appealed the ALJ's decision. On May 16, 2008, the Appeals Council denied Oliver's request for review. Consequently, the ALJ's September 7, 2007 decision was adopted as the Commissioner's final decision.

On July 10, 2008, Oliver filed this action for judicial review. The Commissioner filed an Answer on October 20, 2008. On November 19, 2008, Oliver filed a brief arguing that there is not substantial evidence in the record to support the ALJ's finding that she is not disabled and could perform other work that exists in significant numbers in the

national economy. On January 16, 2009, the Commissioner filed a responsive brief arguing that the ALJ's decision was correct and asking the Court to affirm the ALJ's decision. On October 8, 2008, both parties consented to proceed before a magistrate judge in this matter pursuant to the provisions set forth in 28 U.S.C. § 636(c).

## III. PRINCIPLES OF REVIEW

Title 42, United States Code, Section 405(g) provides that the Commissioner's final determination following an administrative hearing not to award disability insurance benefits is subject to judicial review. 42 U.S.C. § 405(g). Pursuant to 42 U.S.C. § 1383(c)(3), the Commissioner's final determination after an administrative hearing not to award SSI benefits is subject to judicial review to the same extent as provided in 42 U.S.C. § 405(g). 42 U.S.C. § 1383(c)(3). 42 U.S.C. § 405(g) provides the Court with the power to: "[E]nter . . . a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . ." *Id.*

The Court will "affirm the ALJ's decision 'if the ALJ's findings are supported by substantial evidence on the record as a whole[.]'" *Owen v. Astrue*, 551 F.3d 792, 798 (8th Cir. 2008) (quoting *Wagner v. Astrue*, 499 F.3d 842, 848 (8th Cir. 2007)). Evidence is "substantial evidence" if a reasonable person would find it adequate to support the ALJ's determination. *Wiese v. Astrue*, 552 F.3d 728, 730 (8th Cir. 2009) (citing *Eichelberger v. Barnhart*, 390 F.3d 584, 589 (8th Cir. 2004)). Furthermore, "[s]ubstantial evidence is 'something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions does not prevent an administrative agency's findings from being supported by substantial evidence.'" *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (quoting *Cruse v. Bowen*, 867 F.2d 1183, 1184 (8th Cir. 1989), in turn quoting *Consolo v. Fed. Mar. Comm'n*, 282 U.S. 607, 620 (1966)).

In determining whether the ALJ's decision meets this standard, the Court considers "all of the evidence that was before the ALJ, but it [does] not re-weigh the evidence." *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005) (citing *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005)). The Court not only considers the evidence which supports an ALJ's decision, but also the evidence that detracts from his or her decision. *Wagner*, 499 F.3d at 484 (citing *Bowman v. Barnhart*, 310 F.3d 1080, 1083 (8th Cir. 2002)). "[E]ven if inconsistent conclusions may be drawn from the evidence, the agency's decision will be upheld if it is supported by substantial evidence on the record as a whole." *Guilliams*, 393 F.3d at 801 (citing *Chamberlain v. Shalala*, 47 F.3d 1489, 1493 (8th Cir. 1995)).

## IV. FACTS

### A. Oliver's Education and Employment Background

Oliver was born in 1969. She dropped out of school when she was seventeen, but later earned her GED. At the hearing, Oliver testified that she did not have any learning disabilities.

The record contains a detailed earnings report for Oliver. The report covers Oliver's employment history from 1986 to 2006. She earned $7,726.43 in 1990, and then had no earnings from 1991 to 1995. From 1996 to 2000, she earned no more than $10,132.10. From 2001 to 2004, Oliver earned between $15,538.38 and $17,484.58. She earned $1,732.50 in 2005, and had no earnings in 2006.

### B. Administrative Hearing Testimony

#### 1. Oliver's Testimony

At the administrative hearing, Oliver's attorney questioned Oliver about her physical health and symptoms. Oliver testified that her physical symptoms consisted of: (1) "a lot" of pain and fatigue; (2) anxiety about her health; (3) depression about her health; and (4) problems with her fingers locking up. Specifically, Oliver testified that she had pain in her hands, feet, hips and shoulders. She indicated that on good days, the pain was a six

4

or seven on a scale of one to ten with ten being the highest level of pain. On bad days, she claimed that her pain was a ten. Oliver also explained that "[s]itting really bothers my hips and my spine after an hour, and walking. I can walk short periods and then if I sit down and, and take a break, but if I'm constantly standing on my feet or even walking, it really bothers my feet."[1]

Next, Oliver's attorney asked Oliver about her mental health. Oliver indicated that she suffers from panic attacks, anxiety, and depression. Oliver and her attorney further discussed her mental health issues:

> Q: When did, when did the symptoms of panic attacks or anxiety or depression, when did that start for you?
>
> A: It was shortly after 2004 when I first started gong [sic] to Dr. Isaac. He noticed also that my anxiety at times would be quite high and it just seemed to escalate when I would go through being in more pain. The pain kept getting worse and it started out in a few areas with my body and it seemed like it spread to a lot of areas and that caused a lot of anxiety for me. My body was always tensed up. The depression started later on. It wasn't, it was mild. I have episodes where I can be okay and then days that I just, I don't feel like getting up out of bed. I don't feel like doing much of anything. But for me it was the anxiety was a lot worse for me to handle then [sic] the depression.

(Administrative Record at 437-38.) Oliver described her panic attacks as lasting from fifteen to thirty minutes and causing difficulty breathing and feeling faint. Oliver explained that she uses cognitive therapy techniques and relaxation techniques to calm herself down.

Oliver's attorney also asked Oliver to describe her "good" days and her "bad" days:

> A: A good day for me would be to hurt in only a few places in my body and to mentally feel no stress, no anxiety, no depression. To be able to function

---

[1] *See* Administrative Record at 435.

somewhat at a normal life. I still may not get a lot better when I'm having an okay day.

Q: So out, out of a month, how many good days do you think you have?

A: I'd say maybe six or seven days.

Q: Okay. So then what's a bad day for you?

A: A bad day, which is like today I, I wake up and I didn't get much sleep the night before because I had tossed and turned because of my shoulders and hips and my spine. I can't lay in one area for long and I wake up and I, I feel run over, you know, I know that I didn't get a lot of sleep. I, I cannot concentrate. The, the whole day is, it's really hard form [sic] me to go through and even do the simple things that I'm still able to do it. It's a lot more stress for me to do those things and when I heard [sic] a lot in a lot of different areas of my body, even the stretching that I do every morning causes more pain and I deal with it the best I can.

But on a bad day it's, it's really hard for me to deal with a lot of things and I notice that I kind of, I don't really talk to my family. I don't do a lot of talking to my kid when I, and when I'm felling [sic] really bad, I don't shut them out all together, but it, they can tell when I'm having a really bad day. They'll even trying [sic] talking to me and it's, I don't really feel like talking. I don't feel like doing anything. I just kind of want to be of in my own place and, and deal with it the best I can because I don't want other people, I guess, to have to go through this.

(Administrative Record at 450-51.)

### 2. *Vocational Expert's Testimony*

At the hearing, the ALJ provided vocational expert Carma Mitchell with a hypothetical for an individual who:

could lift 20 pounds occasionally, 10 pounds frequently, but [he or] she can only be on [his or] her feet two hours total during a workday. [He or she would] be limited to only occasional contact with the public, regular pace.

(Administrative Record at 452-53.) The vocational expert testified that under such limitations, Oliver could not perform her past relevant work. The vocational expert further testified, however, that Oliver could perform the following work: (1) surveillance systems monitor (200 positions in Iowa and 33,000 positions in the nation), (2) addresser (300 positions in Iowa and 23,800 positions in the nation), and (3) document preparer (600 positions in Iowa and 60,300 positions in the nation). The ALJ asked the vocational expert a second hypothetical with the same limitations as the first hypothetical, except that the individual have the additional limitations of no repetitive gross or fine manipulation, slow pace for up to one-third of the day, and two or more absences per month. The vocational expert testified that under such limitations, Oliver would be precluded from competitive employment.

### C. Oliver's Medical History

On September 27, 2004, Oliver visited Dubuque Rheumatology complaining of left knee, ankle, and foot pain. Upon examination, the doctor[2] found "significant hypertrophy and swelling in the left ankle with tenderness at the joint line, she also has tenderness in the talonavicular joint bilaterally, [and] she has pain on range of motion in both ankles."[3] Oliver was diagnosed with Reiter's disease and joint pain in her lower legs, ankles, and feet. The doctor treated her with prednisone and methotrexate. Oliver had a follow-up visit on November 29, 2004. She reported a 10% to 20% improvement in her pain, but continued to rate her lower extremity pain at 6 to 7 on scale of 1 to 10. She continued treatment with prednisone and methotrexate.

On February 10, 2005, a consultative doctor reviewed Oliver's medical records and provided DDS with a physical residual functional capacity ("RFC") assessment. The consultative doctor determined that Oliver could: (1) occasionally lift and/or carry

---

[2] Oliver's records from Dubuque Rheumatology do not provide the names of the doctor or doctors who treated her.

[3] *See* Administrative Record at 243.

20 pounds, (2) frequently carry and/or lift 10 pounds, (3) stand and/or walk with normal breaks for at least two hours in an eight-hour workday, (4) sit with normal breaks for a total of about six hours in an eight-hour workday, and (5) push and/or pull without limitations. The consultative doctor also determined that Oliver could occasionally climb, balance, stoop, kneel, crouch, and crawl. The consultative doctor further found that Oliver should avoid constant handling and fingering and limited her to only frequent handling and fingering. Lastly, the consultative doctor found no visual, communicative, or environmental limitations.

On February 28, 2005, Oliver had a follow-up appointment at Dubuque Rheumatology. Oliver reported that her leg, ankle, and foot pain was on and off with pain at 7 on scale of 1 to 10. She also complained of daily back pain starting in her neck and radiating into her lower back. She rated the back pain at 8 or 9. She stated that she could not stand for long periods of time. Doctors continued to treat her with prednisone and methotrexate.

On March 15, 2006, Oliver met with Susan G. Freburg, ARNP, ("Freburg"), complaining of reactive arthritis. Upon examination, Freburg found:

> Wrists and small joints of the hands reveal a mild degree of tenderness with trivial synovial fullness. Elbows are nontender with normal range of motion. Shoulder evaluation is full with mild diminished internal range of motion. Neck range of motion is at the lower limits of normal. Cervical thoracic and lumbar spine is diffusely tender. Hip flexion is normal with tenderness in the lateral aspects. Knees show extension lags with mild supratellar fullness. Flexion is normal. Ankles and small joints of the feet are nontender with trivial synovial fullness. Bunions and hallux valgus are seen. Soft tissue tender points are present throughout with the exception of the supraspinatus insertions and hip and knee bursal insertions.

(Administrative Record at 296.) Freburg diagnosed Oliver with seronegative spondyloarthropathy, reactive arthritis, and fibromyalgia. Freburg suggested "lifestyle

modifications including regular exercise, healthy diet and smoking cessation" as treatment.[4]

On April 12, 2006, Oliver had a follow-up appointment with Freburg. Oliver reported that her symptoms varied from day to day and included pain in her knees, hips, shoulders, hands, and wrists. Upon examination, Freburg noted that Oliver had soft tissue points present throughout her body, except in the anterior cervical region. Freburg opined that her soft tissue discomfort, including 16 out of 18 soft tissue tender points on examination, fatigue, and sleep disturbance suggested fibromyalgia. Freburg suggested evaluation by Genesis Hospital's fibromyalgia team as treatment.

On May 9, 2006, Oliver met with Jennifer Rysticken, LMSW, ("Rysticken"), for an initial mental health evaluation. Oliver complained of anxiety and panic attacks. Rysticken noted that Oliver's "symptoms are currently affecting her daily living, social functioning, relationship functioning, and her ability to have regular employment."[5] Rysticken diagnosed Oliver with panic disorder without agoraphobia. She assigned a GAF score of 55. Rysticken recommended individual psychotherapy as treatment. Rysticken concluded that:

> It is anticipated that [Oliver] will be discharged when her symptoms of anxiety no longer interfere with her daily living skills or social/relational functioning. This can be measured by a sustained GAF score of 65 for three consecutive months.

(Administrative Record at 324.)

On June 26, 2006, Oliver was examined by Dr. Nancy E. Sadler, M.D. Upon examination, Dr. Sadler found that:

> the spine reveals mild lower back tenderness but very unimpressive. There are no deformities of the shoulders, elbows, wrists, hands, knees, or ankles. I do not detect any

---

[4] *See* Administrative Record at 297.

[5] *See* Administrative Record at 320.

soft tissue swelling with the exception of possible mild fullness
in the ankles. This is very subtle. Gait is normal.

(Administrative Record at 290.) Dr. Sadler treated Oliver with Methotrexate for her
physical symptoms and Paxil for her anxiety.

On June 30, 2006, Oliver met with Dr. Julianne Davis, Psy.D., for assessment of
her intellectual functioning. Oliver reported to Dr. Davis that she had learning problems
throughout school. Dr. Davis administered the Wechsler Abbreviated Scale of Intelligence
test to Oliver. Oliver achieved a full-scale IQ score of 74, verbal IQ score of 74, and
performance IQ score of 79. Dr. Davis found that Oliver's IQ score suggested multiple
learning disabilities. Dr. Davis concluded that:

> [Oliver's] intellectual functioning makes it unlikely that she
> will be able to do multiple tasks at one time or that she will be
> able to have a high degree of accuracy in her task completion.
> These limitations should be taken into consideration as [Oliver]
> seeks a permanent source of income.

(Administrative Record at 315.)

On August 21, 2006, Oliver had a follow-up appointment with Dr. Sadler. Oliver
reported that she continued to have pain in her upper and lower back and problems with
fatigue. Upon examination, Dr. Sadler found multiple tender points (16 out of 18) which
supported the diagnosis of fibromyalgia. Dr. Sadler addressed Oliver's lifestyle issues and
explained to her the importance of stretching, healthy diet, weight loss, and regular
exercise. Dr. Davis also treated Oliver with Methotrexate and Salsalate.

On September 22, 2006, Oliver met with Dr. Petar S. Lenert, M.D., for evaluation
of her spondyloarthropathy. Upon examination, Dr. Lenert noted that Oliver had
numerous fibromyalgia tender points. Dr. Lenert diagnosed Oliver with chronic
inflammatory spondyloarthropathy, chronic myofascial pain syndrome consistent with
fibromyalgia, and depression. Dr. Lenert treated Oliver with sulfasalazine and naproxen.

On August 20, 2007, Oliver visited Dr. Sadler for "consideration of disability evaluation and continued care for her rheumatologic complaints."[6] Upon examination, Dr. Sadler determined that:

> [Oliver's s]kin is remarkable for multiple 'greater than 50' lesions over the soles of both feet which are darkly pigmented 1-2 mm circular lesions with some overlying peeling of the skin. There are several small scarred lesions of 1-2 mm induration over the lower extremities. . . . Ears: there is a definite thickening, mild erythema and warmth of the upper two-thirds of the external pinna of both ears. Examination of the external auditory canals shows mild thickening but no complete occlusion. I do not notice any erythema of the tympanic membranes but these are not well visualized. . . . Musculoskeletal examination reveals tenderness of both shoulders. Abduction is limited to approximately 90 [degrees] bilaterally. [Oliver] has no appreciable swelling of the elbows or wrists. There are mild Heberden node deformities of the DIP joints. Examination of the knees and ankles reveals no soft tissue swelling. Examination of the back reveals tenderness all along the thoracic and lumbar spine. Sacroiliac joints are also mildly tender. [Oliver] has limited forward flexion.

(Administrative Record at 393.) Dr. Sadler opined that Oliver's symptoms are compatible with a diagnosis of reactive arthritis or Reiter's syndrome. Dr. Sadler also noted that she has severe pain in her joints and thoracic and lumbar spine. Dr. Sadler further noted that the inflammation in her ears was unusual and suggested an autoimmune etiology. Dr. Sadler concluded that "[a]t this time there is no question that [Oliver] is too ill to consider employment even on a part-time basis because of her active ongoing inflammation at multiple sites."[7]

_____

[6] *See* Administrative Record at 393.

[7] *See* Administrative Record at 394; *see also id.* at 392 (In a letter dated August 21, 2007, Dr. Sadler opined that "I do recommend that [Oliver] be considered disabled without
(continued...)

## V. CONCLUSIONS OF LAW

### A. ALJ's Disability Determination

The ALJ determined that Oliver is not disabled. In making this determination, the ALJ was required to complete the five-step sequential evaluation process provided in the social security regulations. *See* 20 C.F.R. § 404.1520(a)(4)(i)-(v); 20 C.F.R. § 416.920(a)(4)(i)-(v); *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987); *Robson v. Astrue*, 526 F.3d 389, 392 (8th Cir. 2008); *Page v. Astrue*, 484 F.3d 1040, 1042 (8th Cir. 2007). The five steps an ALJ must consider are:

> (1) the claimant's work activity, if any; (2) the medical severity of the impairment; (3) whether the medical severity of the impairment equals one of the listings in Appendix 1 of Subpart P; (4) the claimant's residual functional capacity (RFC) and past relevant work; and (5) whether the claimant can perform other jobs in the economy given the claimant's RFC, age, education, and work experience.

*Robson*, 526 F.3d at 392 (citing 20 C.F.R. § 404.1520(a)(4)); *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (same). "If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled." *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006) (citing *Goff*, 421 F.3d at 790, in turn quoting *Eichelberger*, 390 F.3d at 590-91).

In order to establish a disability claim, "the claimant bears the initial burden to show that [he or] she is unable to perform [his or] her past relevant work." *Beckley v. Apfel*, 152 F.3d 1056, 1059 (8th Cir. 1998) (citing *Reed v. Sullivan*, 988 F.2d 812, 815 (8th Cir. 1993)). If the claimant meets this burden, the burden of proof then shifts to the Commissioner to demonstrate that the claimant retains the residual functional capacity ("RFC") to perform a significant number of other jobs in the national economy that are consistent with claimant's impairments and vocational factors such as age, education, and

---

[7](...continued)
question.").

work experience. *Id*; *see also Goff*, 421 F.3d at 790 ("If the claimant establishes her inability to do past relevant work, then the burden of proof shifts to the Commissioner."). The RFC is the most an individual can do despite the combined effect of all of his or her credible limitations. 20 C.F.R. §§ 404.1545, 416.945. "It is 'the ALJ's responsibility to determine [a] claimant's RFC based on all the relevant evidence, including medical records, observations of treating physicians and others, and [the] claimant's own description of her limitations.'" *Page*, 484 F.3d at 1043 (quoting *Anderson v. Shalala*, 51 F.3d 777, 779 (8th Cir. 1995)); 20 C.F.R. §§ 404.1545, 416.945.

The ALJ applied the first step of the analysis and determined that Oliver had not engaged in substantial gainful activity since October 28, 2004. At the second step, the ALJ concluded from the medical evidence that Oliver had the following severe combination of impairments: Reiter's syndrome, spondylosing arthritis, ankylosing spondylitis, irritable bowel syndrome, a history of fibromyalgia, degenerative disc disease, and non-severe anxiety and depression. At the third step, the ALJ found that Oliver did not have an impairment or combination of impairments listed in "20 C.F.R. [§] 404, [Appendix 1, Subpart P, Regulations No. 4 (the Listing of Impairments)]." At the fourth step, the ALJ determined Oliver's RFC as follows:

> [Oliver] has the residual functional capacity to perform light work such that she can occasionally lift 20 pounds and frequently lift 10 pounds; she can be on her feet for a total of two hours in an eight hour work day, maintain occasional contact with the public and work at a regular pace.

(Administrative Record at 20.) At the fourth step, the ALJ determined that Oliver was unable to perform any of her past relevant work. At the fifth step, the ALJ determined that based on her age, education, previous work experience, and RFC, Oliver could work at jobs that exist in significant numbers in the national economy. Therefore, the ALJ concluded Oliver is not disabled.

## B. *Objections Raised by Claimant*

Oliver argues that the ALJ erred in three respects. First, Oliver argues that the ALJ should have found her disabled because her "mental impairment of anxiety meets the criteria of Listing 12.06."[8] Second, Oliver argues that the ALJ erred in determining her RFC. Third, Oliver argues that the ALJ ignored Dr. Sadler's opinion that she could not maintain employment.

### 1. *Listing 12.06*

Oliver argues that:

> There is substantial evidence on the record to support a finding that [Oliver has] anxiety and limitations on her activities of daily living. She must stop what she is doing and remove herself from the situation [to] take a hot shower or go to another room. As a result of the panic attacks [Oliver] has difficulty maintaining social functioning and there are days when she cannot interact with her own family. Her panic attacks are medically documented as well as [] the restrictions of her activities of daily living, her trouble in maintaining social functioning and difficulty maintaining concentration, pace and persistence and repeated episodes of decompensation.

(*See* Oliver's Brief at 7.) Oliver supports her arguments with her own testimony from the administrative hearing held on August 21, 2007. The Commissioner argues that the record supports the ALJ's finding that Oliver does not meets the requirements of Listing 12.06.

Listing 12.06 provides:

> **12.06 *Anxiety-related disorders***: In these disorders anxiety is either the predominant disturbance or it is experienced if the individual attempts to master symptoms; for example, confronting the dreaded object or situation in a phobic disorder or resisting the obsessions or compulsions in obsessive compulsive disorders.

---

[8] *See* Oliver's Brief at 6.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in both A and C are satisfied.

A.    Medically documented findings of at least one of the following:

    1.    Generalized persistent anxiety accompanied by three out of four of the following signs or symptoms:

        a.    Motor tension; or

        b.    Autonomic hyperactivity; or

        c.    Apprehensive expectation; or

        d.    Vigilance and scanning; or

    2.    A persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity, or situation; or

    3.    Recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week; or

    4.    Recurrent obsessions or compulsions which are a source of marked distress; or

    5.    Recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress;

AND

B.    Resulting in at least two of the following:

1.  Marked restriction of activities of daily living; or

2.  Marked difficulties in maintaining social functioning; or

3.  Marked difficulties in maintaining concentration, persistence, or pace; or

4.  Repeated episodes of decompensation, each of extended duration.

OR

C.  Resulting in complete inability to function independently outside the area of one's home.

*See* 20 C.F.R. § 404, Appendix 1, Subpart P, Regulations No. 4 (Listing 12.06).

While the record contains evidence that Oliver suffers from anxiety and panic attacks per her own testimony at the administrative hearing and in her treatment records with Jennifer Rysticken,[9] the record does not contain any medical records or documents which provide that Oliver has *marked* restrictions of activities of daily living, *marked* difficulties in maintaining social functioning, *marked* difficulties in maintaining concentration, persistence, or pace, or repeated episodes of decompensation as required by Listing 12.06. Furthermore, Oliver does not allege that she is unable to function independently outside her home. Therefore, because there is no substantial evidence on the record to support a finding that Oliver meets 12.06B or 12.06C, the Court finds that the ALJ properly determined that Oliver failed to meet the requirements of Listing 12.06.

---

[9] *See* Administrative Record at 320 ("[Oliver's] symptoms are currently affecting her daily living, social functioning, relationship functioning, and her ability to have regular employment."); 324 ("It is anticipated that [Oliver] will be discharged when her symptoms of anxiety no longer interfere with her daily living skills or social/relational functioning.").

*See* 20 C.F.R. § 404, Appendix 1, Subpart P, Regulations No. 4 (Listing 12.06); *Owen*, 551 F.3d at 798.

### 2.   Oliver's RFC

Oliver argues that in determining her RFC, the ALJ failed to consider her mental impairments, ability to maintain contact with the public, work at a regular pace, and maintain a consistent work attendance record. Specifically, Oliver asserts that:

> There is substantial evidence on the record that indicates that the ALJ should have adopted a more restrictive RFC liked [sic] the one he posed to the Vocational Expert that took into account no repetitive gross or fine manipulation, a slow work pace for up to one-third of the day and two or more absences a day. There is substantial evidence on the record to support a finding that the ALJ should have adopted a RFC that included these limitations.

(*See* Oliver's Brief at 8.)

An ALJ has the responsibility of assessing a claimant's RFC, and his or her assessment must be based on all of the relevant evidence. *Guilliams*, 393 F.3d at 803; *see also Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000) (same). Relevant evidence for determining a claimant's RFC includes "'medical records, observations of treating physicians and others, and an individual's own description of his [or her] limitations.'" *Lacroix v. Barnhart*, 465 F.3d 881, 887 (8th Cir. 2006) (quoting *Strongson v. Barnhart*, 361 F.3d 1066, 1070 (8th Cir. 2004)). However, "RFC is a medical question, and an ALJ's finding must be supported by some medical evidence." *Guilliams*, 393 F.3d at 803 (citing *Masterson v. Barnhart*, 363 F.3d 731, 738 (8th Cir. 2004)).

Additionally, a hypothetical question posed to a vocational expert, including a claimant's RFC, must set forth the claimant's physical and mental impairments. *Goff*, 421 F.3d at 794. "The hypothetical question must capture the concrete consequences of the claimant's deficiencies." *Hunt v. Massanari*, 250 F.3d 622, 625 (8th Cir. 2001) (citing *Taylor v. Chater*, 118 F.3d 1274, 1278 (8th Cir. 1997)). The ALJ is required to include

only those impairments which are substantially supported by the record as a whole. *Goose v. Apfel*, 238 F.3d 981, 985 (8th Cir. 2001); *see also Forte v. Barnhart*, 377 F.3d 892, 897 (8th Cir. 2004) (an ALJ need only include those work-related limitations that he or she finds credible); *Haggard v. Apfel*, 201 F.3d 591, 595 (8th Cir. 1999) ("A hypothetical question 'is sufficient if it sets forth the impairments which are accepted as true by the ALJ.' *See Davis v. Shalala*, 31 F.3d 753, 755 (8th Cir. 1994) (quoting *Roberts v. Heckler*, 783 F.2d 110, 112 (8th Cir. 1985)."); *Miller v. Shalala*, 8 F.3d 611, 613-14 (8th Cir. 1993) ("The V[ocational] E[xpert]'s testimony amounts to substantial evidence if the question asked precisely stated the impairments that the ALJ accepted as true. *Rappoport v. Sullivan*, 942 F.2d 1320, 1323 (8th Cir. 1991).").

While Oliver claims that there is substantial evidence on the record as a whole to support the second hypothetical posed by the ALJ at the administrative hearing, she only points to the following evidence: (1) her own testimony at the administrative hearing that her hands and fingers lock up due to pain; (2) her own testimony that she is limited by panic attacks; and (3) her claim that she has borderline intellectual functioning. Significantly, Oliver points to no medical evidence in the record to support her argument or testimony. *See Guilliams*, 393 F.3d at 803 ("RFC is a medical question, and an ALJ's finding must be supported by some medical evidence."). Oliver also provides no explanation or description of limitations which result from her alleged borderline intellectual functioning.[10] Having reviewed the entire record, the Court finds that the ALJ properly considered and credited or discredited Oliver's medical records, the opinions of her treating doctors, and her own testimony in determining her RFC. *See* Administrative Record at 20-24; *Lacroix*, 465 F.3d at 887. The Court further finds that the hypothetical

---

[10] The record contains an intellectual functioning assessment from Dr. Julianne Davis. Dr. Davis found that Oliver's IQ suggested multiple learning disabilities. Dr. Davis opined that Oliver may have difficulty accurately completing multiple tasks at one time. *See* Administrative Record at 314-15.

question to the vocational expert that the ALJ relied on in making his disability determination properly captured the "concrete consequences" of Oliver's limitations. *See Hunt*, 250 F.3d at 625; *see also Goose*, 238 F.3d at 985 (an ALJ is required to include only those impairments which are substantially supported by the record as a whole). Accordingly, the Court finds that the ALJ's RFC determination and hypothetical questions are supported by substantial evidence on the record as a whole. *See Owen*, 551 F.3d at 798.

### 3.  *Dr. Sadler's Opinions*

Oliver argues that:

> The ALJ did not give controlling weight to Dr. Sadler's opinion that [Oliver] was incapable of any work including part-time work. Dr. Sadler based this opinion on an examination of [Oliver] and on her prior clinical treatment of [Oliver]. . . . Dr. Sadler's opinion is based on clinical treatment and not just on self-reporting [by Oliver] as suggested by the ALJ.

(*See* Oliver's Brief at 8.) The Commissioner argues that:

> In his decision, the ALJ fully considered Dr. Sadler's opinion and granted it some but not controlling weight. The ALJ properly noted that the doctor offered her conclusion after she outlined [Oliver's] self-reports of symptoms, and that her opinion was inconsistent with her own medical records and examination. [Oliver] argues that the ALJ erred in relying partially on the doctor's recitation of [Oliver's] self-reports to discount the weight of the opinion as the opinion was based on clinical treatment, but [Oliver] cites to nothing in the record that specifically supports that assertion.

(See Commissioner's Brief at 16-17.)

An ALJ is required to "assess the record as a whole to determine whether treating physicians' opinions are inconsistent with substantial evidence on the record." *Travis v. Astrue*, 477 F.3d 1037, 1041 (8th Cir. 2007) (citing 20 C.F.R. § 404.1527(d)(2)). Controlling weight is given to a treating source's opinion

> if it is well-supported by medically acceptable clinical and
> laboratory diagnostic techniques and is not inconsistent with
> the other substantial evidence in the record. Otherwise, the
> ALJ 'considers all of the following factors in deciding the
> weight to give to any medical opinion': (1) examining
> relationship, (2) treating relationship, (3) supportability,
> (4) consistency, (5) specialization, and (6) other factors.

*Wiese*, 552 F.3d at 730-31 (quoting 20 C.F.R. § 404.1527(d)). The regulations require

an ALJ to give "good reasons" for giving weight to statements provided by a treating

physician. *See* 20 C.F.R. § 404.1527(d)(2). The regulations also require an ALJ to give

"good reasons" for rejecting statements provided by a treating physician. *Id.*; *see also*

*Hamilton v. Astrue*, 518 F.3d 607, 610 (8th Cir. 2008) ("The regulations require the ALJ

to give reasons for giving weight to or rejecting the statements of a treating physician.").

"Although a treating physician's opinion is entitled to great weight, it does not

automatically control or obviate the need to evaluate the record as a whole." *Hogan v.*

*Apfel*, 239 F.3d 958, 961 (8th Cir. 2001) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1013

(8th Cir. 2000)). Thus, "'an ALJ may grant less weight to a treating physician's opinion

when that opinion conflicts with other substantial medical evidence contained within the

record.'" *Wagner*, 499 F.3d at 849 (quoting *Prosch*, 201 F.3d at 1013-14). If an ALJ

credits other medical evaluations over that of the treating physician, then those evaluations

must be "'supported by better or more thorough medical evidence.'" *Id.* An ALJ may

also discount or disregard the opinions of a treating source if the treating source "'has

offered inconsistent opinions.'" *Hamilton*, 518 F.3d at 610 (quoting *Hogan*, 239 F.3d at

961); *see also Travis*, 477 F.3d at 1041 ("A physician's statement that is 'not supported

by diagnoses based on objective evidence' will not support a finding of disability.

*Edwards v. Barnhart*, 314 F.3d 964, 967 (8th Cir. 2003). If the doctor's opinion is

'inconsistent with or contrary to the medical evidence as a whole, the ALJ can accord it

less weight.' *Id.*"); *Strongson v. Barnhart*, 361 F.3d 1066, 1070 (8th Cir. 2004) (an ALJ

does not need to give controlling weight to a physician's RFC assessment if it is

inconsistent with other substantial evidence in the record). The resolution of conflicts of opinion among various treating and examining physicians is the proper function of an ALJ. *Wagner*, 499 F.3d at 848; *see also Pearsall v. Massanari*, 274 F.3d 1211, 1219 (8th Cir. 2001).

In his decision, the ALJ concluded that Dr. Sadler's opinion should receive "[s]ome consideration . . . [but] it does not establish total disability and the inability to perform any work at all. This opinion is of the type not considered to be a medical opinion entitled to deference."[11] The ALJ supports his conclusion by pointing out that Dr. Sadler's August 2007 report provided that Oliver "reported swelling in the joints, lesions on her feet, ulcers of the tongue and recurrent inflammation in the eyes. No supporting documentation is indicated. Dr. Sadler apparently relied largely on [Oliver's] self report."[12] The ALJ also noted that Dr. Sadler's exam revealed inconsistencies with her opinion of total disability such as findings of no acute distress, some tenderness, and some limitation of motion.[13] Having reviewed the entire record, the Court finds that the ALJ properly considered and weighed the opinion evidence provided by Dr. Sadler. *See Travis*, 477 F.3d at 1041. The Court also finds that the ALJ provided "good reasons" for rejecting Dr. Sadler's opinions. *See* 20 C.F.R. § 404.1527(d)(2); *Hamilton*, 518 F.3d at 610; *Strongson*, 361 F.3d at 1070; *Edwards*, 314 F.3d at 967. Accordingly, even if inconsistent conclusions could be drawn on this issue, the Court upholds the conclusions of the ALJ because they are supported by substantial evidence on the record as a whole. *Guilliams*, 393 F.3d at 801.

## VI. CONCLUSION

The Court finds that the ALJ properly determined that Oliver failed to meet the requirements of Listing 12.06, properly determined Oliver's RFC and provided the

---

[11] *See* Administrative Record at 24.

[12] *Id.*

[13] *Id.*

vocational expert with appropriate hypothetical questions, and properly rejected the opinions of Dr. Sadler. Accordingly, the Court determines that the ALJ's decision is supported by substantial evidence and shall be affirmed.

## *VII. ORDER*

For the foregoing reasons, it is hereby **ORDERED**:

1.   The final decision of the Commissioner of Social Security is **AFFIRMED**;

2.   Plaintiff's Complaint (docket number 4) is **DISMISSED** with prejudice; and

3.   The Clerk of Court is directed to enter judgment accordingly.

DATED this 2nd day of June, 2009.

_____

JON STUART SCOLES
UNITED STATES MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA